MARITIME INS. CO., Limited, v. M. S. DOLLAR S. S. CO. †

(Circuit Court of Appeals, Ninth Circuit. February 28, 1910.)

No. 1,753.

**1. APPEAL AND ERROR (§ 1068*)—REVIEW—HARMLESS ERROR—SUBMISSION OF QUESTION TO JURY.**

The erroneous submission to a jury of the question of the law of a foreign country on a given subject, instead of instructing them what the law is, was without prejudice, and not ground for reversal where the jury decided the question correctly.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4225-4228; Dec. Dig. § 1068.*]

**2. INSURANCE (§ 272*)—MARINE INSURANCE—WAR RISKS—IMPLIED CONDITIONS OF POLICY.**

Under a marine policy insuring a vessel for a heavy premium against war risks only on a voyage from San Francisco to Vladivostok during the war between Russia and Japan, which expressly gave the assured "liberty to run blockade," the consent of the insurer to the carrying by the vessel of false clearance papers, showing her destination to be a Japanese port, is necessarily implied as a subterfuge which by general usage is resorted to by blockade runners in the interest of both the insured and insurer, and the fact that the vessel was seized and condemned by the Japanese authorities on the ground of carrying such false papers is not a defense to liability on the policy under either the English or American law.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 577; Dec. Dig. § 272.*]

In Error to the Circuit Court of the United States for the Northern District of California.

Action by the M. S. Dollar Steamship Company against the Maritime Insurance Company, Limited. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 149 Fed. 616.

William Denman, for plaintiff in error.

Nathan H. Frank and Walter D. Mansfield, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

ROSS, Circuit Judge. At the time of the making of the contract of insurance upon which this action was brought, a state of war existed between Russia and Japan. In December, 1904, the defendant in error, being desirous of sending the steamship M. S. Dollar on a voyage from San Francisco to Vladivostok, caused the ship to be insured for the aggregate amount of £37,000 by various English insurers; the plaintiff in error being one of the insuring companies in the sum of £3,000, for the recovery of which sum the present suit was brought. The policy described the risk as "those risks excluded

by the warranted free from capture, seizure, and ·detention clause in marine policy or policies," and covered the voyage from the port of San Francisco to Vladivostok, while there, and thence back to a safe neutral port. Vladivostok was at that time the principal naval station and base of supplies of Russia in its contest with Japan, and was being closely invested by the Japanese. The premium fixed in the policy was 25 per cent., with a provision to the effect that 5 per cent. thereof should be returned should the ship sail before a certain date (subsequent to her actual departure), and 5 per cent. further if there were no claim made under the policy. The policy also contained an express provision giving the assured the "liberty to run blockade." The insurance in question was effected through the agency of Bowring & Co., an English firm of brokers doing business ·in London and also in San Francisco; one Comyn being their Pacific Coast manager. Comyn testified, over the objections and exceptions of the defendant·company, that between him and the assured it was agreed as a condition precedent to the delivery of the policy in question, as well as the other policies taken out by the ship, that the premium should be prepaid at San Francisco simultaneously with such delivery, and arrangements were accordingly made by the assured with the Bank of California at San Francisco for the payment by it of the premiums to the Pacific Coast agent of Bowring & Co. upon receipt of the policies. In pursuance of that agreement, Mr. Comyn forwarded the application for the policies to Bowring & Co. at London, who, in turn, having procured the policies in London, forwarded them to their Pacific Coast agent, by whom they were delivered to the Bank of California at San Francisco on the payment of the premiums, the premiums being then forwarded by Comyn to the London firm; and this was the procedure in the case of the policy in suit. The M. S. Dollar, being so insured, sailed from San Francisco December 31, 1904, on her voyage. Before her departure, the master of the vessel was directed by its managing owner to proceed to Vladivostok via La Perouse Straits if they were not blocked with ice, and, in the event of their being frozen, then to go through the Straits of Tsugar, and through the Sea of Japan. The evidence shows that the master left San Francisco with the intention of going through La Perouse Straits, which lie between the northernmost island of the Japanese group and the Kuril Islands. Tsugar Straits are further south, and lie between the Island of Yeddo and the main island of the Japanese group. The case shows that, for the purpose of evading capture by the Japanese, a false clearance of the ship was taken at San Francisco for Moji, Japan. The master, having found La Perouse Straits blocked by ice, passed to and through the Straits of Tsugar, and was then discovered in the Sea of Japan by a Japanese man of war, and, on the discovery of the falsity of her papers, the ship was taken in custody and conducted to Yokosuka. After the seizure, and on the 1st day of February, 1905, the assured abandoned the ship to the insurance company, and she was in due course condemned by the Japanese Prize Court, and sold as a prize of war; the decree placing her condemnation on the ground that she was using the false papers as a means to evade capture.

The plaintiff in error insists that the contract of insurance, was made in England, and must, in consequence, be controlled by the then prevailing law of England, and that it was error in the court below to leave to the jury, as it did, the determination as a fact of what the English law then was. The testimony of the witness Comyn tended to show that the contract in question was executed in San Francisco, in which event it would, of course, be controlled by the American rule upon the subject. Whether or not it becomes necessary to pass upon the defendant company's objections to the testimony of Comyn will depend upon the conclusion we reach upon the main question in the case.

We assume that the trial court was in error in refusing to determine and declare to the jury what the law of England was upon the subject in hand, and in leaving to it the determination of that matter as a question of fact. Nevertheless, if the case shows that the jury decided that question of law correctly, its submission to it by the court in the form it was submitted was without harm to the defendant. Minneapolis & St. L. R. Co. v. Col. Rolling M. Co., 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376; Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420. The policy in suit, as has been said, expressly gave to the assured the "liberty to run blockade." It was, as a matter of course, only in view of the risks of the then prevailing war that the premium of 25 per cent. could be justified, and was paid. Insurance companies, like everybody else, must be held to know that blockade runners in war times resort, and necessarily must resort, to many kinds of subterfuge—among others to the carrying of false papers. Indeed, that is one of the most notorious.

In Buck v. Chesapeake Insurance Company, 1 Pet. 151, 160, 7 L. Ed. 90, the Supreme Court said:

"A knowledge of the state of the world, of the allegiance of particular countries, of the risks and embarrassments affecting their commerce, of the course and incidents of the trade on which they insure, and the established import of the terms used in their contract, must necessarily be imputed to underwriters. According to a distinguished English jurist, Lord Mansfield, in Pelly v. Royal Exchange, etc., 1 Burr. 341, 'the insurer, at the time of underwriting, has under his consideration the nature of the voyage, and the usual manner of conducting it. And what is usually done by such a ship, with such a cargo, on such a voyage, is understood to be referred to by every policy.' Hence, when a neutral, carrying on a trade from a belligerent to a neutral country, asks for insurance 'for whom it may concern,' it is an awakening circumstance. No underwriter can be ignorant of the practice of neutrals to cover belligerent property under neutral names, or of the precautions ordinarily resorted to that the cover may escape detection. The cloak must be thrown over the whole transaction, and in no part is it more necessary than in the correspondence by other vessels, so often overhauled by an enemy, for the very purpose of detecting covers on other cargoes. Letters, thus intercepted, have often been the groundwork of condemnation in admiralty courts; and underwriters, to whom the extension of trade is always beneficial, must and do connive at the practice in silence. They ask no questions, propose their premiums, and the contract is as well understood as the most thorough explanation can make it."

Two English cases—Horneyer v. Lushington, 15 East, 46, and Oswell v. Vigne, 15 East, 70, decided January 28 and January 31, 1812, respectively—are relied upon by the plaintiff in error as establish-

177 F.—9

ing the proposition that at the time of the execution of the contract of insurance here involved the law of England was that an insurer is not liable on a war risk policy for a condemnation because of the use of false papers, unless permission to carry false papers is expressly given in the policy. At the time, of the execution of the policies involved in those cases Sweden and Russia were at war. The policy in Horneyer v. Lushington was on goods "at and from Gottenburg to Riga, beginning the adventure on the goods from the loading thereof aboard the ship at Gottenburg." It appeared in the case that the ship sailed with a license and took on board simulated papers, representing that she came from Bergen in Norway. She arrived at Gottenburg, from whence, after receiving orders, she proceeded to and arrived at Riga, where her papers were taken and her hatches immediately sealed down by the government officers until her papers could be sent to St. Petersburg to be examined; and on such examination orders were immediately sent to Riga to seize the ship and cargo, which was done, and she was afterwards condemned with her cargo on the ground of having simulated papers on board. Lord Ellenborough, with whom concurred the other judges, said:

"I do not pronounce whether the carrying of simulated papers was or was not an enhancement of the risk insured; but my opinion is founded on the effect of the sentence of condemnation, which has proceeded upon the mere personal act of the assured in carrying such papers, which it treats as a crime, and which act is thereby proved to have been the efficient cause of the loss, the very ground of the condemnation. How, then, can the underwriter be answerable for a loss which happened from an act of the assured, done without his leave?"

Oswell v. Vigne was an action on a policy of assurance on the ship Wassila at and from London to any port or ports in the Baltic. The interest was averred in one Yakof Fomin and a total loss alleged upon attack and seizure of the enemy. It appeared at the trial that Fomin was a Russian subject; that the ship sailed with a license, the voyage insured from London to Petersburg, and, after touching at Gottenburg, was captured by a Danish privateer, carried into Arlborg, and condemned as prize to the captors, which sentence of condemnation was afterwards on appeal affirmed by the Court of Admiralty at Copenhagen. It appeared that the captain on the voyage used false papers, which was at least one of the causes for the condemnation of the vessel. Lord Ellenborough said:

"This ship had simulated papers on board. The question then is, if the carrying them were one of the causes of her condemnation. If it were, it was a risk to which the underwriter has been exposed without his consent."

The other judges concurred in that conclusion.

In neither of those English cases did the policy of insurance contain any express consent to the carrying of false papers, nor did either of them contain any clause from which such consent could be inferred.

In the case at bar the insurer expressly stipulated in the policy that the assured should be at "liberty to run blockade." Expressly consenting to that, it expressly consented to whatever acts are usually

done in such undertakings, and which, in the usual course of events, were to be expected. And such we understand to be the law of England, as well as of this country. The following excerpts from 2 Duer on Insurance, p. 627, are directly pertinent to the distinction above indicated:

"Sec. 47. The use of false papers to disguise the true character, ownership, or destination of the property insured, or any other circumstances, by which it may be rendered liable to capture or seizure, stands substantially on the same grounds as the want of necessary documents. Where no permission to use such papers is given by the insurer, or his consent to assume the risk, from the known usage of the trade, or other circumstances, cannot be implied, he is not responsible for the loss that the simulated papers may have occasioned, or to which they may have contributed. The risk in such cases is excepted, even where it is not included by a warrant or representation, and the loss, as in the former case, is considered as resulting from a wrongful act of the assured, for which, under the general terms of the policy, the insurer is never liable. Nor is the exemption of the underwriter to be limited to the cases in which false papers are used to conceal the character or ownership of the property insured. The goods insured may be innocent and lawful, and their character as such may be apparent on the bill of lading, and other papers; and yet they are justly liable to confiscation where the assured, or his agent, seeks to cover, by simulated papers, the unlawful goods of other persons shipped by the same vessel. If the policy in such a case embraces a warranty of neutrality, and the goods covered are belligerent property, the act of the assured as a breach of the warranty vitiates the contract; and, where there is no such warranty, as if creates a risk not contemplated by the insurer, he is exonerated from the loss.

"Sec. 48. The language of the Court of King's Bench in some of the reported cases seems to imply that the leave to carry simulated papers must be given by an express provision in the policy, and that a mere disclosure to the insurer of the intention to use them would not be sufficient to charge him with the risk. It is, however, certain from other cases in the English courts and from numerous decisions in the United States that where the carrying of false papers, in the voyage or trade to which the insurance relates, is a known or general usage, or where the use of such papers, from the very nature of the voyage, is indispensable, the law will impute to the insurer the knowledge of the fact and imply his consent to assume the risk; and it appears to be a necessary inference from these decisions that the insurer must be equally liable where his knowledge of the facts is proved by evidence of a direct representation prior to the insurance. Where he subscribes the policy with a knowledge of the facts, his consent to assume the risk may be as justly implied in the one case as in the other."

"In Planche v. Fletcher, Doug. 283, the true destination of the ship was concealed by a false clearance, and it was insisted that the omission to disclose the fact was a fraud upon the underwriters; but Lord Mansfield said: 'There was no fraud on them or on anybody, since what had been practiced had been proved to be the constant course of the trade, and notoriously so to everybody.' From this usage, therefore, the underwriter's knowledge of the fact and his consent to assume the risk were inferred. In Livingston v. Maryland Ins. Co., 7 Cranch, 506 [3 L. Ed. 421], where false papers were used to disguise the true ownership of the property, it was urged as a fatal objection to the plaintiff's recovery that the intention to use those papers was not communicated to the underwriter, but the reply was that the papers were rendered necessary by the nature of the trade insured, and by its known course and usage. And Chief Justice Marshall, in delivering the opinion of the court, laid down the general rule in these words: 'Where the underwriters know, or by the usage and course of trade ought to know, that certain papers ought to be on board for the purpose of protection, in one event, which, in another, might endanger the property, they tacitly consent that the papers shall be so used as to protect the property.' The property in this case was in reality American, but the false papers gave it a Spanish character for the

purpose of protecting it in the ports of a Spanish colony to which she was destined, and where a trade by Americans was prohibited. As Spain and England, however, were at war, the false papers exposed the property to English capture, and it was from this cause that the loss arose. The opinion of the court was that, if the jury believed from the evidence that the use of the papers was necessary or justified by the usage of the trade, there was no concealment that could affect the right of the plaintiff to recover. Calbreath v. Gracy, 1 Wash. C. C. 198 [Fed. Cas. No. 2,295]; Maryland Ins. Co. v. Bathurst, 5 Gill & J. [Md.] 159. Le Roy v. United Ins. Co., 7 Johns. [N. Y.] 343, recognizes the same rule that, where the use of false papers is warranted by the use of the trade, it is not necessary to be disclosed to charge the underwriter with a risk; a fortiori, leave to carry the papers is not necessary to be given by the policy. So, where the policy, by specific or general words, covers the risk of belligerent property, the use of false papers to give a neutral character to the property is not necessary to be disclosed, on the ground 'that no underwriter can be ignorant of the practice of neutrals to cover belligerent property, and of the measures ordinarily resorted to in order that the cover may escape detection.' Buck & Hedrick v. Chesapeake Ins. Co., 1 Pet. 151 [7 L. Ed. 90], opinion of Mr. J. Johnson. It may be added in this case the use of false papers can be no ground of complaint to the insurer, for instead of increasing it diminishes the risk that he agrees to assume, by lessening the chances of a capture and condemnation. The cover is as much for the benefit of the underwriter as of the assured. It seems, therefore, a very just observation of Benecke, on the decision of the King's Bench, in Oswell v. Vigne, that, as it was known to the insurer when the policy was effected that the vessel insured would be liable to seizure in the continental port of destination unless by false papers the fact of her having sailed from England could be concealed, his consent to the use of such papers ought to have been implied. They were rendered necessary by the nature of the voyage, and it was for the benefit of the insurer that they should be used. It may be regarded as certain that in the United States such would have been the decision. 3 Benecke, 331."

Being of opinion, as we are, that both under the law of England and that of the United States the defendant company, under the facts shown, were liable to the assured by the terms of the policy, it is unimportant whether the contract was executed in London or in San Francisco, and therefore it is unnecessary to pass upon the objections made to Comyn's testimony.

We think no other point made calls for special notice, although all of them have been carefully considered.

The judgment is affirmed.